```
                    UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

UNITED STATES OF AMERICA,      .  Case No. 4:23-cr-00422-6
                               .
               Plaintiff,      .
                               .
        v.                     .
                               .
JOE FRANK BARRERA, et al.,     .  515 Rusk Street
                               .  Houston, TX 77002
               Defendants.     .
                               .  Tuesday, October 3, 2023
. . . . . . . . . . . . . . .  .  10:01 a.m.


      TRANSCRIPT OF DETENTION HEARING AS TO JOSEPH ROY GOMEZ
              BEFORE THE HONORABLE SAM S. SHELDON
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

| | |
|---|---|
| For the Government: | United States Attorney's Office<br>By:  JOHN MICHAEL LEWIS, ESQ.<br>1000 Louisiana, Suite 2300<br>Houston, TX 77002<br>(713) 567-9577 |
| For the Joseph Roy Gomez: | Essmyer Law Firm<br>By:  MICHAEL M. ESSMYER, SR., ESQ.<br>6602 Westview Drive<br>Houston, TX 77055<br>(713) 869-1155 |
| Audio Operator: | Courtroom ECRO Personnel |
| Transcription Company: | Access Transcripts, LLC<br>10110 Youngwood Lane<br>Fishers, IN 46048<br>(855) 873-2223<br>www.accesstranscripts.com |

    Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>I N D E X</u>
<u>10/3/2023</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE GOVERNMENT: | | | | |
| Joshua Lyons | By Proffer | 7 | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Government's Exhibit 1 | 5 |
| Government's Exhibit 2 | 5 |
| Defense Exhibits 1 through 4 | 21 |

```
 1        (Proceedings commence at 10:01 a.m.)

 2             THE COURT:  Okay.  Next case is 23-CR-422-6-6.

 3             MR. LEWIS:  Good morning, Your Honor.  John Michael

 4   Lewis representing the United States.

 5             THE COURT:  Good morning.

 6             MR. ESSMYER:  Mike Essmyer for the defendant,

 7   Your Honor.

 8             THE COURT:  Okay.  Please be seated.  We already did

 9   his arraignment, right?

10             MR. ESSMYER:  Yes.

11             THE COURT:  Okay.  Are you ready to proceed,

12   Mr. Essmyer?

13             MR. ESSMYER:  We are ready to proceed, Your Honor.

14             THE COURT:  Okay.  Any objection, Mr. Essmyer, as

15   marking as Government -- as marking and admitting as Government

16   Exhibit 1 that -- the proffer for detention hearing?

17             MR. ESSMYER:  I'm objecting that it was hearsay.

18   There were parts of it that are more than hearsay and includes

19   alleged statements of my client, and I have not seen the 302 of

20   the statements of my client today.

21             THE COURT:  Okay.  Well, the -- I'll deal -- so what

22   about -- let me -- there's several objections.  So the hearsay

23   one's overruled.  We're only admitting the proffer for the

24   limited purpose of this hearing.  Hearsay is allowed at a

25   detention hearing.  But what -- the proffer does include
```

1  statements of the defendant.  Was any of those statements yet

2  provided?

3           MR. LEWIS:  No, Your Honor.  The agent is here who is

4  working on those statements and the reports of those statements

5  in an effort to get them ready.  As the Court's aware, we've

6  had several defendants who were arrested.  The agent's been

7  diligently working on those reports.  And if Mr. Essmyer wanted

8  a recess so he would have access to those reports, obviously,

9  we're willing to make an effort to make that happen.  The

10  agent's present to testify about the circumstances.  There are

11  recordings, obviously, we could provide in advance to

12  Mr. Essmyer if he so chose to -- you know, to have those prior

13  to his client's detention hearing.

14           THE COURT:  So let me ask you this, Mr. Essmyer, what

15  if I don't use those -- I mean, I'll let you do what you want

16  to do, if you want more time.  But I don't think I need to use

17  those -- I mean, there's events that are, to me, undisputed.

18  The Government's evidence about certain shootings, I don't need

19  to use his statements.  But those events still took place.

20  But -- so you tell me what you want to do and I'm happy to --

21           MR. ESSMYER:  Proceed.

22           THE COURT:  Okay.

23           MR. ESSMYER:  We want to proceed.

24           THE COURT:  So I just won't consider -- unless the

25  agent's the one that took the statement, I'm just not going

```
 1   to -- I won't consider those statements.  But I think there's

 2   other evidence in the record.  So I'll admit that proffer to --

 3   for detention hearing for the limited purpose of this hearing.

 4        (Government's Exhibit 1 admitted into evidence)

 5             THE COURT:  Any objection to the pretrial report as

 6   admit -- marked and admitted as Government's Exhibit 2?

 7             MR. ESSMYER:  No, Your Honor.

 8             THE COURT:  Okay.

 9        (Government's Exhibit 2 admitted into evidence)

10             THE COURT:  So how we're going to proceed,

11   Mr. Essmyer, is that the proffer is in essence the officer's

12   direct examination.  We'll swear him in.  We'll have him state

13   his name.  And then I'm going to turn it over to you for cross.

14             MR. ESSMYER:  Thank you, Your Honor.

15             THE COURT:  Okay.

16             MR. LEWIS:  And --

17             THE COURT:  And I don't need the -- unless the video

18   is related to the shootings -- I mean, it's already in my mind.

19   I've seen it.  I read everything.  I'm good with that, so --

20             MR. LEWIS:  Understood, Your Honor.  I do think --

21   without watching the video, I do think the agent can, in a

22   sentence or two, probably summarize for the Court --

23             THE COURT:  Right.

24             MR. LEWIS:  -- what this defendant's actions on the

25   video would be.  So if the Court --
```

```
1              THE COURT:  Okay.  Perfect.
2              MR. LEWIS:  -- so chooses, the agent is prepared to
3    do that as well, so --
4              THE COURT:  Okay.  Perfect.
5              MR. LEWIS:  And for the record, the Government calls
6    Lieutenant Josh Lyons to the witness stand.
7              THE COURT:  Okay.
8              MR. ESSMYER:  And Your Honor, I ask that the Court
9    take judicial notice of the proceedings that occurred last
10   week, which includes the video.
11             THE COURT:  Yes, will do.
12             THE CLERK:  Please raise your right hand, please.
13              JOSHUA LYONS, GOVERNMENT'S WITNESS, SWORN
14             THE CLERK:  Okay.  You may be seated.
15             THE COURT:  Good morning, sir.
16             THE WITNESS:  Good morning, sir.
17             MR. ESSMYER:  May I move so --
18             THE COURT:  Yeah, you can get wherever you want to
19   stand.  Just talk into the microphone so we can hear you.
20             THE COURT:  And Officer Lyons, can you state your
21   name for the record?
22             THE WITNESS:  Joshua Lyons.
23             THE COURT:  And who are you employed by?
24             THE WITNESS:  I'm a lieutenant with the Inspector
25   General's Office of the Texas Department of Criminal Justice, a
```

1    task force officer with the FBI Houston Safe Streets Gang Task

2    Force.

3              THE COURT:  And how long have you employed by the

4    officer -- Office of Inspector General?

5              THE WITNESS:  Seventeen years, sir.

6              THE COURT:  Okay.  And we've admitted the proffer for

7    detention hearing as Exhibit 1.  Is everything in there true

8    and correct?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.  Go ahead, Mr. Essmyer.

11                      CROSS-EXAMINATION

12   BY MR. ESSMYER:

13   Q    Did you interview my client, Joseph Gomez?

14   A    I have interviewed him before, yes, sir.

15   Q    Was that back in April?

16   A    Of this year?

17   Q    Yes.

18   A    Yes, sir.

19   Q    Was it in April or May or June?  Or what -- how many times

20   did you interview him?

21   A    I've interviewed him this year twice.

22   Q    Did others interview him besides yourself?

23   A    Yes, sir.

24   Q    Who else interviewed him?

25   A    I believe he was interviewed by the Montgomery County

Lyons - Cross                                                  8

1    Sheriff's Office detectives, and he was interviewed another

2    time by Huntsville Police Department detectives, and there were

3    some others present as well, I believe, from -- from my task

4    force.

5    Q    Was that at his mother's house?

6    A    He was interviewed at his mother's house when he was --

7    when a search warrant, I believe, was executed there.  He was

8    interviewed at the Huntsville Police Department.  And I -- I'm

9    not sure if that's where the Montgomery County Sheriff's Office

10   interviewed him there or at their office.  I'd -- I -- I would

11   have to look at the -- at the reports.

12   Q    Well, let me go back.  The original event that's in the

13   indictment occurred in September of 2020, did it not?

14   A    Yes, sir.

15   Q    When did you first get the video?

16   A    We obtained the video approximately a few days later, sir.

17   I'd -- I'd have to look at our report on what day we got it

18   from the owner of the banquet hall.

19   Q    So you've had the video -- how did you place names on

20   people in the video?

21   A    We -- we watched it several times.  Through our experience

22   of investigating the -- the Homietos Outlaw Motorcycle Gang and

23   becoming familiar through surveillance and all our different

24   means, we were able to pinpoint the subjects, and then

25   interviewing some witnesses as well.  And then, other means of

1  putting individuals there, we were able to isolate them with

2  the -- this program that's called Camtasia where we will --

3  where -- where we were able to zoom in on the video on specific

4  individuals and follow them around throughout the course of the

5  evening.

6  Q    And yet, you arrested no one in 2020, did you?

7  A    For that crime, no, sir.

8  Q    You didn't arrest anybody for that crime in 2021, did you?

9  A    No, sir.

10 Q    Didn't arrest anybody for that crime in 2022, did you?

11 A    No, sir.

12 Q    Didn't arrest anybody for that crime until, what,

13 September of 2023?

14 A    Yes, sir.

15 Q    How many years is that?

16 A    Three.

17 Q    If they were a danger to themselves or other, wouldn't

18 you, in your procedures, have arrested somebody before then?

19         MR. LEWIS:  I'm going to object to speculation and

20 argumentative, Your Honor.

21         THE COURT:  I'll overrule it.  Go ahead.

22 BY MR. ESSMYER:

23 Q    According to your procedure, if the people that you were

24 investigating you believed to be a danger to themselves or

25 other, your procedures would mean for you -- or have you --

Lyons - Cross                                    10

1           THE COURT:  So Mr. Essmyer, this is a hard thing,

2    because we're -- so let me just tell you directly what happened

3    last week, and because I get nervous about you asking certain

4    questions, because those questions, like, we -- you and I may

5    have a common-sense interpretation of the questions, but I

6    don't want to put him in an unfair position.  So let me just

7    give you the conclusion of what happened is that what we've

8    learned from these hearings is that the officers wanted to

9    arrest people back in 2020, but that the prosecutors made a

10   decision not to.  And so let's just leave it at that.  Because

11   you start asking questions, it just puts him in an unfair

12   position to answer these things that have technical things, and

13   I'm just telling you common sense will happen.

14           MR. ESSMYER:  Thank you, Your Honor.

15           THE COURT:  Okay.

16           MR. ESSMYER:  Although --

17           THE COURT:  So we know -- so the conclusions -- I

18   just gave you the conclusions.  These guys wanted to -- I say

19   these guys, the agents or the officers wanted to arrest people.

20   The Government -- the prosecutors made a decision not to.  And

21   so to just ask him to make decisions or answer questions more

22   on that is kind of unfair to me.  But you can ask, and I'll

23   tell you if I think it's appropriate for him to answer or not.

24           MR. ESSMYER:  Yes, Your Honor.

25           THE COURT:  Okay.

1  BY MR. ESSMYER:

2  Q    So let me go back to April of 2023.  Despite all these

3  interviews, you did not arrest Mr. Gomez in April of 2023, did

4  you?

5  A    No, sir.

6  Q    You didn't arrest him in June, did you?

7  A    June of this year?

8  Q    Yes.

9  A    No, sir.  And I -- and the only reason I -- I -- I speak a

10 little bit more is I know he -- we were aware he had a bond

11 revocation warrant or something like that.  We were trying to

12 locate him, but just did not find him.  I'm not sure the date

13 of that warrant.

14 Q    Do you know if it was satisfied?

15 A    Sir?

16 Q    Do you know if it was satisfied or not?

17 A    I don't understand, sir.

18 Q    The bond warrant?

19 A    Well -- and again, I'm not sure if it was bond or

20 probation, but it was a -- it was a warrant that had been

21 issued for his arrest here in the past few weeks, which then,

22 of course, was served when he was arrested on this federal

23 indictment.

24 Q    All right.  So we're not talking about April, May, or

25 June, we're talking about September.

1   A    I think the warrant might have been July or August as

2   well.  I'm -- I'm not sure, sir, for the bond or probation,

3   whatever it was.

4   Q    In any event, he wasn't arrested until September of 2023?

5   A    Yes, sir.  Yes, sir.

6   Q    And so once again, you could have arrested him back in

7   April.  Is that fair?

8   A    On what charge?

9   Q    The event of April of 2023 that's in your proffer.

10  A    We were still investigating that due to the multiple

11  people involved in it, sir.

12  Q    So as we sit here, you can't tell me what the involvement

13  of the different individuals is as to the April 2023 event, can

14  you?

15  A    I -- we know, but the case is still under investigation.

16  Q    I missed that.  Did you say, me know?

17          THE COURT:  But without jeopardizing the --

18          THE WITNESS:  We.  We.

19          THE COURT:  -- investigation --

20          THE WITNESS:  Yes, sir.

21          THE COURT:  -- is there anything that you can say?  I

22  don't want you to jeopardize an ongoing investigation.  But is

23  there anything that you can say about his involvement --

24          THE WITNESS:  Oh --

25          THE COURT:  -- that wouldn't -- I --

```
 1                 THE WITNESS:  About Mr. Gomez's involvement --

 2                 THE COURT:  Yes.

 3                 THE WITNESS:  -- in that April?

 4    BY MR. ESSMYER:

 5    Q    Yes.

 6    A    I can definitely answer specifics based off of our

 7    evidence and video surveillance, his statements.  I'd be happy

 8    to answer anything specific, sir.

 9    Q    Were you present for his statement involving the April

10    2023 event?

11    A    One of them, yes, sir.  He was interviewed a few times.  I

12    was present for the one interview up at the Huntsville Police

13    Department.

14    Q    And what did he say to you, in your presence, as to his

15    involvement in this 2023 event?

16    A    To summarize or from what I can recall without the actual

17    transcript in front of me, the -- the Homietos Outlaw

18    Motorcycle Gang members, many of them were on their way from

19    the Houston area to Oklahoma City to attend a funeral for a

20    member who had been killed in a shootout between Homietos and

21    Bandidos in -- in a bar the weekend before April 1st or 2nd or

22    3rd.  And they were -- they were convoying up together.

23         Mr. Gomez decided to ride his motorcycle wearing his

24    Homietos cut and he was being followed by some other Homietos

25    members in a vehicle and some other vehicles were staggered in
```

1  time behind them.  He -- he observed some Bandidos getting

2  parallel to him, and from what we knew, from our

3  investigations, the Homietos and Bandidos are at war with each

4  other:  shootings, assaults, et cetera.  There was -- they were

5  just kind of looking at each other.  The vehicle behind

6  Mr. Gomez with his Homietos colleagues opened fire on the

7  Bandidos striking both of them, one of the fatally.

8       And Mr. Gomez exited with the vehicle.  We have him on

9  surveillance taking a firearm out of his cut, waistband area.

10  Mr. Gomez, who was prohibited from having a firearm at the time

11  by law, passed it to the vehicle.  And then they waited there,

12  and then continued to -- and then more Homietos met them.

13  Mr. Gomez got into another vehicle that was the vehicle that

14  opened fire on more Bandidos in Huntsville, fatally striking

15  two of them, wounding one.

16  Q    All right.  When you arrested Mr. Gomez, you found no

17  weapons at either his house or his girlfriend's house or on

18  him, did you?

19  A    This -- this recent arrest?

20  Q    Yes.

21  A    At -- at the gas station, he was arrested at the gas

22  station, so he wasn't at anybody's residence.

23  Q    Yeah, but you searched his mother's house, right?

24  A    I'm not -- I think they went back on a consent search,

25  didn't -- and didn't find anything.

1  Q    They took his vest and his helmet and his boots.

2  A    Okay.  Yes, sir.

3  Q    And you searched his girlfriend's house, right?

4  A    I did not.

5  Q    But you didn't find any weapon associated with Mr. Gomez,

6  did you?

7  A    Not in September, no, sir.

8  Q    And I understand your position, but he was not the shooter

9  in the April event, was he?

10  A    From our knowledge of the shooting in Huntsville, no.  We

11  have not concluded the one in Montgomery County.

12           MR. ESSMYER:  I'm just making sure -- may we have

13  a --

14           THE COURT:  Sure.

15           MR. ESSMYER:  Did the other detainee leave?

16           MR. LEWIS:  He already left, yeah.

17           THE COURT:  Yeah, he left.

18           MR. ESSMYER:  Oh, he is gone.

19           MR. LEWIS:  Yes, sir.

20           THE COURT:  Yeah.

21           MR. ESSMYER:  All right.

22  BY MR. ESSMYER:

23  Q    Mr. Gomez cooperated with you over the shooting in April,

24  did he not?

25  A    Yes, sir.

Lyons - Cross                                          16

1    Q    He tried to help figure out what happened.  Is that fair?

2    A    Yes, sir.

3    Q    And this cooperation puts him in danger, does it not?

4    A    Ultimately, if he -- if he testifies against some of these

5    other Homietos members, they would probably frown upon that,

6    unless they cooperated themselves.

7    Q    And did he come to the Government or did the Government --

8    how did the Government solicit his cooperation?

9    A    Once we identified him, sir, we were able to -- we just

10   basically sat up a surveillance on his -- on his residence.  We

11   observed a stolen motorcycle at his residence as well and then

12   decided to make contact -- well, actually obtained a search

13   warrant and then made contact with him that way during the

14   execution of the search warrant for evidence of the homicides

15   and to recover the stolen motorcycle.

16   Q    And did he tell you that he was trying to distance himself

17   from the Homietos.

18   A    He -- he said that.  But --

19   Q    Well, that's all I asked you --

20   A    Yes, sir.

21   Q    -- was did he say that?

22   A    He did.

23   Q    All right.  And so he admitted to you he was trying to

24   distance himself and he cooperated with the Government.  Is

25   that fair?

1    A    Cooperation, but minimization.

2    Q    Well, he told you who was present on the April event.  Did

3    he not?

4    A    He did.  Yes, sir.

5    Q    And he told you where they were at.  Did he not?

6    A    Told us where they were at?

7    Q    Well, that they were in Houston.

8    A    Well, we -- we know where they reside and hang out, but

9    yes, sir.

10   Q    Were you one of the ones that told him that he would not

11   be arrested?

12   A    Arrested for what?

13   Q    For anything?

14   A    No one told him he would not be arrested for anything,

15   that specifically was told to him.

16   Q    For the April event?

17   A    That was never told to him.

18   Q    What was told to him about what the Government might do

19   for him?

20   A    He was told specifically that the Government had evidence

21   of additional crimes that he was involved in, that he made

22   acknowledgement of, at least at first, including a shooting

23   back in 2020 -- February of 2020.  And then, of course, the

24   April event that -- that yes, he was cooperating and that it

25   would -- any assistance he provided would be noted and

 1  documented and you know, we would speak to his benefit for his

 2  cooperation.  But he was never told he would not be charged

 3  with any crime.

 4  Q    All right.  But you told him that he would benefit from

 5  his cooperation.  Is that fair?

 6  A    Yes, sir.

 7  Q    Now that we're in -- we've divulged or dived into it, what

 8  was his participation in the February shooting of 2020?

 9  A    He pulled the trigger.

10  Q    And who'd he pull the trigger on?

11  A    Bandidos out on the Beltway 8 in Houston.

12  Q    What Bandido?

13  A    Do I need to say his name?

14         THE COURT:  No, don't get into names.

15  BY MR. ESSMYER:

16  Q    There -- but there was a shooting.

17  A    Yes, sir, documented case worked by us.

18  Q    Since 2020, aside from the April event, there has been no

19  other problem from Mr. Gomez, has there?

20  A    That's not true, sir.

21         THE COURT:  There's the September 2020 event.

22         MR. ESSMYER:  Well he had a February 2020, a

23  September 2020, and then an April --

24         THE COURT:  Right.  But then there's also the state

25  charge of the September 2021 evading arrest that he was

                              Lyons - Cross                        19

 1   convicted of.

 2            THE WITNESS:  Yes, sir.

 3   BY MR. ESSMYER:

 4   Q    All right.  Other than those, was there any other problem?

 5   A    Not by law enforcement contact.  From some cellular phone

 6   examines that we were able to perform under search warrant, we

 7   saw some evidence of conversations where he was admitting

 8   having shot at Bandidos.  We weren't able to document that it

 9   happened, but we saw the conversation.

10   Q    He was bragging?

11   A    Yes, sir.

12   Q    So you don't know if it was a true brag --

13   A    Yes, sir.

14   Q    -- or a brag-brag, right?

15   A    Fair.

16            MR. ESSMYER:  I'll end the examination, Your Honor.

17            (Witness excused)

18            THE COURT:  Okay.  Thank you.  What would you like to

19   proffer, Mr. Essmyer?

20            MR. ESSMYER:  I've -- Judith Williams (phonetic), the

21   girlfriend, is present in the courtroom, Your Honor.

22            THE COURT:  Okay.  What would she testify to?

23            MR. ESSMYER:  She would testify that he has lived

24   with -- she has lived with Mr. Gomez for two years, that she

25   loves him dearly, that she would help make sure that he stayed

1  within the perimeters of his pretrial release, that she's known

2  him since high school, that she would allow him to still live

3  there, and would help him with an ankle bracelet or home

4  curfew, whatever.

5         He has a daughter.  The daughter's birthday is today

6  actually.  She's eight years old.  Then, the mother is here

7  also, Lucy Gomez or Lucielle Gomez (phonetic).  She would

8  testify basically to the same.  I'd proffer the same material

9  for her.  She also would allow him to live with her should it

10  be required.

11         He -- she would also testify that he takes care of

12  his disabled dad, Roy Gomez, 63 or 64, and he takes the dad to

13  the doctors.  He's -- the dad is disabled.  And she would

14  testify that he does have leatherwork that he'd need to do from

15  the house if he was confined to the house.  And he did do work

16  at refineries like Valero.

17         Then I have a letter from Judith Williams, a letter

18  from Jennifer Armino (phonetic), letters of support, Jessica

19  Sheldon (phonetic) and James R. Sheldon (phonetic).  May I

20  tender those?

21         THE COURT:  Yes, you may.

22         MR. ESSMYER:  And I've given the copies to you.

23         THE COURT:  Okay.

24         MR. LEWIS:  And I have no objection to these,

25  Your Honor.

1          THE COURT:  Okay.  So we'll enter these into the

2     record as Government's -- sorry, Defense Exhibits 1, 2, 3, and

3     4.

4          (Defense Exhibits 1 through 4 admitted into evidence)

5          MR. ESSMYER:  And I ask the Court for the same

6     consideration that was given to the other defendants in this

7     case, and not hold the client -- just because he's cooperating

8     with -- it seems odd that he's cooperating at the same time,

9     but --

10          THE COURT:  Well, I don't -- so let me -- let's

11     address that issue first.  So first, I -- like, whether -- I

12     can't encourage Mr. Gomez to cooperate or not and I have

13     nothing to do with that.  If the Government came to me at a

14     later date -- so what I'm about to say is if the Government

15     came to me at a later date and said that they wished for him to

16     be released because he was cooperating, that's something I'd

17     consider.  I mean, anybody that knows if the Government and

18     defense come to an agreement, I can't think of anytime I

19     haven't followed the agreement, even if it wasn't something I

20     was going to do.  I'm a strong believer, if they come to an

21     agreement, that I'll honor that agreement on the bond.

22          But again, I'm not encouraging Mr. Gomez to do

23     anything.  If he wishes to cooperate, that's -- you know, it's

24     probably in his best interest, but I can't control that, and

25     that's up for the Government to decide what they're going to

1   do.

2           As anyone that sat through these hearings, a couple

3   things are evident.  You know, the -- I've given people bond

4   against the Government's vehement opposition.  This is -- you

5   know, I'm a strong believer in following what pretrial has

6   said.  Pretrial has recommended detention in this case.  It's a

7   rebuttable presumption case.  For the record, I'll find that

8   you've rebutted the presumption.  But my issue is this,

9   Mr. Gomez, Mr. Essmyer, and his family is that, you know, I

10  look at each of these cases individually, but we start with --

11  you know, the seminal event to me was the September 20th

12  assault and what happened before and after that.

13          And before this, you know, we have evidence of a

14  shooting in February of 2020 where, you know, the officer just

15  testified that they believe Mr. Gomez was -- pulled the

16  trigger, and I'm not litigating that case.  I'm just saying

17  what's going through my mind.  And then, we have the

18  September 2020.  And then we have a completely -- I don't know

19  if it's related or unrelated, but he was convicted in September

20  of 2021 of felony evading arrest.  He's on probation so any of

21  the events that occurred after 2021, he was on probation.

22          And then, we have the April of 2023 event, and we

23  don't really know what his involvement is.  He's there on a

24  shooting, but at minimum, he's a felon in possession, so

25  he's -- you know, he's violating the terms of his probation at

1   that time when he's involved in that in April of 2023.

2          So I believe that the Government's presented clear

3   and convincing evidence that there's no conditions or

4   accommodations of the conditions that I can set at the present

5   time.  But again, I say again, that in the future, if the

6   Government believes that there's some benefit based on his

7   cooperation of him getting a bond, I'm happy consider that.

8   But I just want him and you to make whatever decisions that you

9   think is in his best interest.  I'm just being as transparent

10  as I can with you about what the future holds.

11          Anything else, Mr. Lewis, you'd like me to cover?

12          MR. LEWIS:  No, Your Honor, thank you.

13          THE COURT:  Okay.  Mr. Essmyer, anything else?

14          MR. ESSMYER:  Nothing at this time, Your Honor.

15          THE COURT:  Okay.  Good luck, sir.

16          MR. ESSMYER:  Thank you.

17          THE COURT:  Okay.  Sure.

18          MR. LEWIS:  Thank you, sir.

19          THE COURT:  Thank you.

20       (Proceedings concluded at 10:28 a.m.)

21                              * * * * *

22

23

24

25

1                                    **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428      DATE: November 7, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25